Oct. 27, 1937.

## SALT LAKE COUNTY v. UTAH COPPER CO.

### No. 1554.

Circuit Court of Appeals, Tenth Circuit.

Nov. 22, 1937.

128

Mahlon E. Wilson, of Salt Lake City, Utah (Henry D. Moyle, Robert C. Wilson, Harold E. Wallace, Co. Atty., and Brigham E. Roberts, Deputy Co. Atty., all of Salt Lake City, Utah, on the brief), for appellant.

C. C. Parsons, of Salt Lake City, Utah (A. C. Ellis, Jr., and Wm. McCrea, both of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS and WILLIAMS, Circuit Judges, and SYMES, District Judge.

PHILLIPS, Circuit Judge.

The Utah Copper Company brought this action against Salt Lake County, Utah, to recover the sum of $251,509.90, being the amount of tax for the year 1935 paid by the Copper Company under protest upon its metalliferous mines situated in Salt Lake County. From a judgment in favor of the Copper Company for $85,828.21 the county has appealed.

The cause came on for trial before a court and jury. At the conclusion of the evidence both sides moved for a directed verdict. Thereupon the parties in open court orally waived trial by jury.

The record consists of the pleadings, special findings of fact, conclusions of law and judgment. It contains no bill of exceptions.

The statutes of Utah provided in 1935, that metalliferous mines should be assessed at $5.00 per acre plus a value equal to three times the net annual proceeds thereof for the calendar year next preceding. [1]

---

[1] The term "net annual proceeds" is defined by section 5864, Laws Utah 1931, c. 53, p. 218, as amended by R.S.Utah 1933, 80-5-57, as follows:

"The words 'net annual proceeds' of a metalliferous mine or mining claim are defined to be the gross proceeds realized during the preceding calendar year from

They further provided that all machinery used in mining, all property or surface improvements upon or appurtenant to mines or mining claims, and the value of any surface use made of mining claims or mining property for other than mining purposes should be assessed at full value.

The facts disclosed by the findings are these:

Ordinarily mine owners ship their product of crude ores, concentrates, and precipitates to the smelter, where they are sampled, assayed, purchased, and paid for by the smelter pursuant to the terms of smelting contracts. In that manner the Copper Company disposed of its gold and silver produced in the years 1909 to 1932, inclusive. The Copper Company has produced blister copper [2] in such large quantities that it has never been practical for the smelter to purchase it, and since January 1, 1933, the Copper Company has not sold its gold and silver to the smelter, but has paid the smelting and refinement charges and taken delivery from the refinery of its gold and silver along with its blister copper and sold the refined product as rapidly as the market would absorb it.

In 1910 the taxing authorities appraised the whole of the copper production for 1909, including the sold and unsold blister copper, and added thereto the amount received for the gold and silver produced in 1909 to arrive at the gross proceeds and deducted therefrom the statutory production costs for the year 1909 to arrive at the net annual proceeds, to be used as a basis for taxation for the year 1910. . For the years 1911 to 1932, inclusive, the taxing authorities followed the method employed in 1910.

Effective January 1, 1933, the Copper Company made a new smelting contract whereby gold and silver were no longer purchased by the smelter, but were thereafter delivered to the Copper Company along with the blister copper, and thereafter to and including the year 1935 the taxing authorities appraised the Copper Company's production of gold and silver as they had previously appraised the copper and included such appraised value of gold and silver in the Copper Company's gross annual proceeds.

In the year 1931 the Copper Company continued to operate its mine, but was unable to dispose of the copper produced because there was no market therefor; and as a result it had on hand and unsold on January 1, 1932, 67,752,587 pounds of copper. The assessing authorities appraised this copper and included it in the gross proceeds of the Copper Company in valuing its mines for the year 1932.

In the years 1933 and 1934 a new method was employed to determine the Copper Company's net annual proceeds. In those years the taxing authorities permitted the

the sale or conversion into money or its equivalent, of all ores from such mine or mining claim extracted by the owner or lessee, contractor or other person working upon or operating the property, including all dumps and tailings, during or previous to the year for which the assessment is made, less the following, and no other, deductions:

"(1) The amount of money actually expended during the year for labor, tools, appliances and supplies used in the mining operations, including the labor of the lessee and his employees and the amount expended by the lessee for tools, appliances and supplies used by him in his mining operation; *provided*, that the personal labor of lessees shall be computed at the prevailing wage.

"(2) The actual and necessary office and clerical expenses and the salaries of employees, other than corporate officers, within the state.

"(3) The actual cost of the installation, construction, maintenance and repair of machinery and improvements made during the year in and about the workings of the mine for use in extracting the ores.

"(4) The actual cost of reduction works and mills, and improvements thereof, constructed during the year and operated in connection with the mine.

"(5) The actual cost of the transportation of the ore from the mine to the market or reduction works.

"(6) The actual cost of sampling, assaying, reducing and smelting the ore and extracting the metals and minerals therefrom.

"(7) The amount paid for state and local taxes during the year.

"(8) The amount paid for compensation insurance, or, in lieu of such compensation insurance, for compensation of injured employees, and the compensation paid to dependents of killed employees, required to be paid under the workmen's compensation laws of this state."

[2] Copper that has passed through the smelting process; metallic copper of a black blistered surface. It is the final product of converting copper matte, and is about 96-99 per cent pure.

Copper Company to return for inclusion in its gross proceeds only its actual sales of copper made during the year preceding, but appraised the gold and silver production, and from such total gross proceeds deducted the statutory costs of producing the copper sold and the gold and silver appraised and thereby arrived at the Copper Company's net annual proceeds. This change of method was made at the request of the Copper Company for accounting convenience.

In the years 1933 and 1934 the Copper Company sold more copper than it produced during those years and hence each year sold a part of its inventory on hand January 1, 1932.

In employing the sales method in lieu of the appraisal method to determine the production for 1933, as a basis of valuation for 1934, sales in 1933 from current production and also from the unsold inventory on hand January 1, 1932, were included. Since the inventory stock had been appraised and used as the basis for determining gross production for 1932, a double tax was imposed for the year 1934, to the extent of $43,630.39. The Copper Company, however, paid the excess tax without protest.

In the year 1934 the Copper Company sold out of the inventory on hand January 1, 1932, 14,804,016 pounds of copper, and in addition the copper it produced during 1934. In the year 1935 the taxing authorities added to the appraised value of the 1934 production of gold and silver, the gross proceeds received by the Copper Company from the sales of copper made in 1934 to arrive at gross proceeds, but, over the Copper Company's protest, refused to allow any deductions to cover production costs of copper sold in 1934 but produced in prior years. In other words, in arriving at the gross proceeds for 1934 the taxing authorities included the sales in 1934 of 14,804,016 pounds of copper made from the January 1, 1932 inventory and the sales made from 1934 production, but refused the Copper Company any deductions for costs of producing the copper sold from inventory.

Thereupon the Copper Company demanded a return to the old method of appraisal of the year's production. The taxing authorities refused. The Copper Company paid the alleged excessive tax under protest and brought this action to recover it.

Taxation of net annual proceeds of mines was first provided by chapter 129, Laws of Utah 1896, effective April 5, 1896. It provided that the taxpayer's statement each year must show the gross yield and cost of production and reduction of the ores and "the conversion of the same into money, or its equivalent, during the year." Section 63. The statute was reenacted by the Revised Statutes of Utah 1898, §§ 2504, 2566, 2567, 2568, without substantial change. The statute was amended in 1899. It continued to provide for the taxation of the net annual proceeds of mines and employed the phrase "the conversion of the same [the ore] into money, or its equivalent, during the year." Laws of Utah 1899, pp. 103, 104; Comp.Laws of Utah 1907, §§ 2504, 2566, to 2568, inclusive.

The statute was again amended in 1909 (Laws 1909, pp. 99, 100). But likewise continued to provide for the taxation of the net annual proceeds and employed the phrase above quoted. Comp.Laws of Utah 1917, §§ 5864, 5929 to 5931, inclusive. The latter law continued until January 1, 1919. On that date section 4, article 13 of the Constitution of the State of Utah as amended became effective. It provided for the assessment of all metalliferous mines or mining claims "at a value based on some multiple or sub-multiple of the net annual proceeds thereof." Comp.Laws of Utah 1917, p. 94-A.

Pursuant to the constitutional amendment the legislature adopted a statute which provided that the value of metalliferous mines should be determined by multiplying their net proceeds by three. Laws Utah 1919, c. 114, § 5864. The act last referred to defined "net annual proceeds" as follows:

"The net proceeds realized during the preceding calendar year from the sale, or conversion into money, or its equivalent, of all ores from such mine or mining claim," after making certain specified deductions from the gross proceeds.

On November 4, 1930, section 4, article 13 of the Constitution of the State of Utah was amended to provide that all metalliferous mines should be assessed as the legislature should provide. R.S.Utah 1933, p. 57. In 1931 the legislature amended certain provisions of the statute relating to the taxation of metalliferous mines, but again defined net annual proceeds as follows:

"The words 'net annual proceeds' of a metalliferous mine or mining claim as used in this section are defined to be the *net proceeds realized during the preceding calendar year from the sale, or conversion into money, or its equivalent, of all ores from such mine or mining claim,*" after making certain specified deductions. (Italics ours.) Laws Utah 1931, pp. 217, 218, § 5864.

The statute was reenacted by the Revised Statutes of Utah 1933, 80-5-57, without material change in the definition of net annual proceeds. See note 1.

From the foregoing it will be seen that the definition of gross annual proceeds has remained substantially the same throughout the taxing acts of Utah since 1896.

Section 5929, Laws of Utah 1931, pp. 217, 224, as amended by R.S.Utah 1933, 80-5-59, in part reads:

"Every person engaged in mining or working a vein or lode, or placer mining claim, or dumps, or tailings, containing gold, silver or other metalliferous mineral deposits, shall make and file with the tax commission, on or before the 10th day of February in each year, a sworn statement showing the gross annual proceeds from each mine or mining claim and the production thereof in fine ounces of gold and silver and other precious metals, and in pounds of lead, copper and other semi-precious and base metals, and the deductions provided for in section 80-5-57."

Blister copper has an established and readily ascertainable market value, and when the taxing authorities were apprised of the number of pounds produced it was a simple matter to appraise its value in money.

Throughout the period of the Copper Company's operations from 1909 to 1934, inclusive, with the exception of the two years when a change in method was made at the request of the Copper Company, the taxing authorities arrived at the value of the gross proceeds by adding to the product produced and sold the appraised value of the product produced but not sold during the year preceding the taxing year, and excluded sales of product produced in prior years. In so doing the administrative authorities of the state charged with the duty of administering the taxing statutes construed the phrase "gross proceeds realized * * * from the sale or conversion into money or its equivalent, of all ores from such mine" to embrace not only proceeds realized from sales but the appraised value of unsold blister copper. In the face of this administrative construction the legislature repeatedly amended the taxing statutes of Utah respecting metalliferous mines without any substantial change in such phrase which had been so construed by the taxing authorities. The reenactment of a statute without amendment in the face of a consistent administrative construction is persuasive evidence of legislative recognition and approval of such construction. National Lead Co. v. United States, 252 U. S. 140, 146, 40 S.Ct. 237, 239, 64 L.Ed. 496; McCaughn , v. Hershey Chocolate Company, 283 U.S. 488, 492, 51 S.Ct. 510, 512, 75 L.Ed. 1183; Helvering v. Bliss, 293 U.S. 144, 151, 55 S.Ct. 17, 20, 79 L. Ed. 246, 97 A.L.R. 207; Fox v. Standard Oil Company, 294 U.S. 87, 96, 55 S.Ct. 333, 337, 79 L.Ed. 780; Globe Indemnity Company v. Bruce (C.C.A. 10) 81 F.(2d) 143, 152.

The trial court concluded that the phrase "gross proceeds realized during the preceding calendar year from the sale or conversion into money or its equivalent, of all ores from such mine," embraced the amount received from sales in such year of blister copper, gold and silver bullion produced in such year, and the amount of the blister copper, gold and silver bullion produced in such year but remaining unsold at the end of the year, the latter amount to be arrived at by appraisal; and that the Copper Company was entitled to have deducted therefrom the production costs as defined in the statute in determining the net annual proceeds. The court further concluded that the state was without authority to adopt a basis of taxation that would include in the factors for arriving at the valuation of gross proceeds in a given year, that which had been included in the factors for arriving at a valuation of gross proceeds in a preceding year. The court rendered judgment for the amount of taxes paid in excess of an amount arrived at in accordance with its construction of the statute.

The word "money" has been defined as follows:

"The simple meaning of 'money' is of course current coin, but it may be extended to mean 'possessions expressible in money values.' It has really no technical meaning. It is of ambiguous import and

may be interpreted having regard to all the surrounding circumstances under which it is used. * * * The question in each case is what is the true meaning of the word having regard to its collocation. There is no hard and fast rule to be applied." In re Taylor, [1923] 1 Ch. 99, 15 British Ruling Cases 1.

"The word 'money' is often and popularly used as equivalent to 'property.'" In re Miller's Estate, 48 Cal. 165, 17 Am. Rep. 422.

"Wealth reckoned in terms of money; capital considered as a cash asset; specif., such wealth or capital dealt in as a commodity to be loaned, invested, or the like; wealth considered as a cash asset." Webster's New International Dictionary, Second Edition.

"The word 'money' is popularly and correctly used as indicating property of every description." Fleck v. Harmstad, 304 Pa. 302, 155 A. 875, 877, 77 A.L.R. 874.

That the legislature used the term "money" in a comprehensive sense is indicated by the fact that it followed it with the phrase "or its equivalent." "Equivalent" has been defined as follows:

"'Equivalent' is defined by lexicographers as 'equal in value, force, measure, power and effect.'" Kelley v. Clark, 23 Idaho 1, 129 P. 921, 925, Ann.Cas.1914 C, 665.

"The word 'equivalent' means: 'Equal in worth or value, force, power, effect, import and the like.' Webster's International Dictionary." McLean v. Moran, 38 Mont. 298, 99 P. 836, 837.

"The Oxford Dictionary defines 'equivalent' as 'having equal or corresponding import, meaning or significance; what is virtually the same thing; identical in effect.' According to Webster it means 'equal in worth or value, force, power, effect, import and the like; alike in significance and value; of the same import or meaning.' * * * 'Equivalent' means 'of equal value' (Robinson v. Noble's Adm'rs, 8 Pet. 181, 199, 8 L.Ed. 910), or 'equal in worth or value, force, power, effect, import and the like' (McLean v. Moran, 38 Mont. 298, 99 P. 836)." In re Bonsall's Estate, 288 Pa. 39, 135 A. 724, 725.

■ It would seem that these authoritative definitions of the terms "money" and "equivalent" fully justify the construction so long followed by the administrative authorities and adopted by the trial court.

Section 80-5-55, R.S.Utah, 1933, in part reads:

"The state tax commission must prepare each year a book called the 'Assessment Book of Mines,' in which must be entered the assessment of all mines in the state subject to assessment by it, and in which must be specified in separate columns, and under the appropriate head:

"(1) Owner of mine.

"(2) Name and description and location of the mine.

"(3) County in which it is situated.

"(4) Net proceeds in dollars, if a metalliferous mine.

"(5) Value of mine.

"(6) Value of machinery.

"(7) Value of supplies and other personal property.

"(8) Value of improvements.

"(9) Value of machinery, property and surface improvements having a value separate and independent of all such mines or mining claims assessed by the state tax commission, and the names of the owners of the same.

"Together with such other information as the tax commission may determine."

After the decision of the trial court in the instant case section 80-5-55 was amended so as to require the specification of the following additional items:

"(5) Number of tons of ore mined whether by the owner, lessee, contractor or otherwise.

"(6) *Amount received for ore and metal if sold; if not sold the value thereof.*" (Italics ours.) Laws Utah 1937, c. 101, p. 193.

Thus it appears that by the 1937 amendment the legislature again recognized and approved the long followed administrative construction by expressly providing for the appraisal and specification of the value of unsold ore produced in the preceding year.

■ Counsel for appellant urge that the net annual proceeds should be arrived at by ascertaining the amount received from sales made during the year preceding the assessment year, regardless of when the ore was produced, and deducting therefrom the costs for such preceding year. Such a construction would leave meaning-

less and useless the phrase "or conversion into money, or its equivalent," which manifestly means something more than a mere sale.

It is a cardinal rule of construction of statutes that effect should be given, if possible, to every word, phrase, clause, and sentence.[3] It should not be presumed that any provision is redundant or useless.[4] "All the words of a law must have effect, rather than that part should perish by construction." Aaron v. United States (C.C.A. 8) 204 F. 943; Westerlund v. Black Bear Mining Co. (C.C.A. 8) 203 F. 599, 608.

We are of the opinion that the trial court correctly construed and applied the statute.

The judgment is therefore affirmed.

[3] Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704; Ex parte Public National Bank of New York, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202; Chicago Great Western R. Co. v. Farmers' Shipping Association (C.C.A.10) 59 F.2d 657, 659; Pillsbury Flour Mills Co. v. Great Northern Ry. Co. (C.C.A.8) 25 F.2d 66, 69; United States v. Ninety-Nine Diamonds (C.C.A.8) 139 F. 961, 963, 2 L.R.A.(N.S.) 185; Holman v. Cross (C.C.A.6) 75 F. 2d 909, 911; In re Central States Freight Corporation (Fruehauf Trailer Co. v. United States Trust Co.) (C.C.A. 6) 45 F.2d 73, 75; Sullivan v. Associated Billposters and Distributors (C.C.A.2) 6 F.2d 1000, 1001, 42 A.L.R. 503; United States v. Daniels (C.C.A.2) 279 F. 844, 849; North American Creamery Co. v. Willcuts (D.C.Minn.) 38 F.2d 483, 487.

[4] Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704; Ex parte Public National Bank of New York, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202; United States v. Landram, 118 U.S. 81, 85, 6 S.Ct. 954, 30 L.Ed. 58; Platt v. Union Pac. R. Co., 99 U.S. 48, 58, 59, 25 L.Ed. 424; Fetzer v. Johnson (C.C.A.8) 15 F.2d 145, 151; United States v. Ninety-Nine Diamonds (C.C.A.8) 139 F. 961, 963, 2 L.R.A.(N. S.) 185; Winterbottom v. Casey (D.C. Mich.) 283 F. 518.