**MARATHON OIL COMPANY, Amoco Production Company, Atlantic Richfield Company, and Continental Oil Company, Plaintiffs,**

**Mobil Oil Corporation, Chevron U.S.A., Inc., Union Oil Company of California, and Tenneco Oil Company, Intervenors,**

v.

**Cecil D. ANDRUS, Secretary of the Interior, et al., Defendants.**

**Nos. C77–166–K, C77–210–K, C77–237–K and C77–238–K.**

United States District Court, D. Wyoming.

June 26, 1978.

William H. Brown and Claude W. Martin, Casper, Wyo., for plaintiffs and intervenors; H. Blair Klein and David O. Cordell of Marathon Oil Co., Casper, Wyo., Floyd E. Radloff of Continental Oil Co., Houston, Tex., V. C. McClintock and Frank H. Houck of Amoco Production Co., A. T. Smith of Continental Oil Co., Denver, Colo., Albert D. Hoppe and James R. Coffee of Atlantic Richfield Co., Dallas, Tex., William Balkovatz and Delbert E. Winn, of Chevron, U.S.A., Inc., Denver, Colo., Dee H. Richardson of Union Oil Co. of California, Midland, Tex., Millard F. Carr of Tenneco Oil Co., Robert L. Kubik of Mobil Oil Corp., Denver, Colo., Donald E. Peterson of Pillsbury, Madison & Sutro, San Francisco, Cal., and John W. Coughlin of Moran, Reidy and Voorhees, Denver, Colo., of counsel.

Gerald S. Fish, Atty., U. S. Dept. of Justice, Washington, D. C., and Charles E. Graves. U. S. Atty., Cheyenne, Wyo., for defendants.

## MEMORANDUM OPINION

KERR, District Judge.

These consolidated actions were brought by Plaintiffs and Intervenors seeking judicial review of adverse decisions of the Secretary of the Interior.

In each case, the jurisdiction of this Court is invoked under 28 U.S.C. § 1331(a); the Administrative Procedure Act, 5 U.S.C. §§ 701–706; the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Federal Mandamus Statute, 28 U.S.C. § 1361 et seq.

They are properly brought in this judicial district under 28 U.S.C. § 1391(e).

The actions stem from the issuance of a Notice by the Secretary dated November 15, 1974 and effective December 1, 1974, the material portions thereof being as follows:

*Royalty Payment on Oil and Gas Lost*
NTL–4

"Effective December 1, 1974, royalty or other compensation will be due on the value of all oil and gas which is produced pursuant to or for the benefit of all onshore Federal oil and gas leases except that gas production specifically exempted by section 3 of this Notice. Onshore Federal leases subject to this Notice are those which are now in effect and those subsequently issued pursuant to the Mineral Leasing Act of February 25, 1920, as amended and supplemented (30 U.S.C. 181–263) (except those previously issued pursuant to sections 18 or 19 thereof), the Mineral Leasing Act for Acquired Lands of August 7, 1947 (30 U.S.C. 351–359), and the implied authority of the Executive Branch as defined in the Attorney General's Opinion of April 2, 1941 (Vol. 40 Op.Atty.Gen. 41).

Oil production subject to royalty shall include (1) that oil which is produced and sold either on a lease basis or that which is allocated to a lease under the terms of an approved communitization or unitization agreement; (2) *that oil which is used on a lease, communitized tract, or unitized area for production purposes*; (3) *that oil which is lost in well tests, spills, blowouts, and fires which occur on a lease, communitized tract, or unitized area*; and (4) that oil which is unavoidably or otherwise lost on a lease, communitized tract, or unitized area." (Emphasis added.)

"Gas production subject to royalty shall include (1) that gas (both dry and casinghead) which is produced and sold either on a lease basis or that which is allocated to a lease under the terms of an approved communitization or unitization agreement; (2) that gas which is vented or flared in well tests (drill-stem, completion, or production) on a lease, communitized tract, or unitized area; and, (3) that gas which is otherwise vented or flared

on a lease, communitized tract, or unitized area with the prior written authorization of the Area Oil and Gas Supervisor (Supervisor)."

The Administrative Procedure Act provides in part:

"The reviewing Court shall— * * * (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

These actions arise under the Mineral Leasing Act of 1920, as amended, 41 Stat. 437, 30 U.S.C. § 181 et seq., and the Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 351 et seq.

They draw into question the validity of the above Notice relating to the manner of determining oil and gas production subject to royalty payable on Federal Onshore Oil and Gas Leases. They contend the aforesaid Notice is a reversal of the interpretation by the Secretary of Interior that had been uniformly and consistently understood and applied by both the government and the lessees for a period of more than fifty years.

More particularly, they involve the propriety, legality and correctness of the Secretary's decision that royalty is payable to the United States on oil and gas which is unavoidably lost or used in the lease, or production operations under permits or leases issued under the Mineral Leasing Act and the Mineral Leasing Act for Acquired Lands, supra.

The material facts are not in dispute. Most of the facts, if not all, alleged in the complaint in each case are admitted by the defendants in their answers to the complaints.

The plaintiffs and intervenors are lessees, working interest owners or operators of many federal onshore oil and gas leases administered by the United States Department of the Interior. Many of their leases are committed to federal units. As lessees, plaintiffs and intervenors pay royalties to the United States. The powers of the Secretary are established and limited by the Mineral Leasing Act of February 25, 1920, as amended, and Regulations lawfully adopted pursuant thereto. These actions seek interpretation and construction of the phrase in the Mineral Leasing Act, as amended by the Act of August 8, 1946, 30 U.S.C. § 181 et seq., which requires the payment of percentage royalties in the *"amount or value of the production removed or sold from the lease."* (Emphasis added.) The Act of February 25, 1920, as amended by the Act of August 8, 1946 provides in part:

"Sec. 17. All lands subject to disposition under this Act which are known or believed to contain oil or gas deposits may be leased by the Secretary of the Interior. When the lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible, qualified bidder by competitive bidding under general regulations, in units of not exceeding six hundred and forty acres, which shall be as nearly compact in form as possible, upon the payment by the lessee of such bonus as may be accepted by the Secretary and of such royalty as may be fixed in the lease which shall be not less than *12½ per centum in amount or value of the production removed or sold from the lease.* When the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this Act shall be entitled to a lease of such lands without competitive bidding. *Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease.* Leases issued under this section shall be for a primary term of five years and shall continue so long thereafter as oil or gas is produced in paying quantities." (Emphasis added.)

The current Federal Form of Lease Agreements provides:

"Section 2. The lessee agrees:

\* \* \* \* \* \*

(d) *Rentals and royalties*—(1) To pay rentals and royalties in *amount or value of production removed or sold from the leased lands as follows* :

\* \* \* \* \* \*

*Royalty on production.* To pay the lessor 12½ percent royalty on the production removed or sold from the leased lands computed in accordance with the Oil and Gas Operating Regulations, 30 CFR Pt. 221."

The legislative history discloses that the purpose of the August 8, 1946 amendment to the Mineral Leasing Act was to encourage and stimulate the discovery of new petroleum reserves and the development of known petroleum reserves. Until the issuance of said NTL–4 Notices, the practice of the United States Department of the Interior has been to further this purpose of the Mineral Leasing Act.

Singular as it may appear, the Mineral Leasing Act has been amended seventeen times since its original enactment, and it has been amended seven times since the August 8, 1946 amendment which altered the language of Section 17 of the Mineral Leasing Act to read "production removed or sold from the lease," and since August 8, 1946, Section 17, supra, has remained intact with respect to the language "production removed or sold from the lease."

Judge Phillips held in *Salt Lake County v. Utah Copper Co.*, 93 F.2d 127, 131 (10th Cir. 1937), cert. denied 303 U.S. 652, 58 S.Ct. 750, 82 L.Ed. 1112:

"The re-enactment of a statute without amendment in the face of a consistent administrative construction is persuasive evidence of legislative recognition and approval of such construction."

Prior to the issuance of the NTL–4 Notice, the practice of the United States Department of the Interior had been that, in determining the amount of production to which royalty rates will be applied, no royalty is payable on oil or gas unavoidably lost, used in lease or producing operations on the leasehold premises, or beneficially used for purposes of production on the leasehold.

For more than half a century, both the government, as lessor, and all of its lessees have understood and have been governed by the pertinent statutes to the end that all oil and gas used on the lease for ordinary production purposes or unavoidably lost were not subject to royalty payments to the government. Nor has the Department attempted to collect royalties on the aforesaid oil and gas unavoidably lost or used in venting or flaring in the processing facilities until the issuance of the NTL–4 Notices. Thus, the question for determination is whether requiring plaintiffs and intervenors to pay royalties on this type of oil and gas is arbitrary and capricious.

It is the position of the plaintiffs and intervenors that neither the Mineral Leasing Act of 1920, as amended, nor the Acquired Lands Leasing Act of 1947, permit the charging of royalties, penalties or assessments on such oil or gas. Plaintiffs and intervenors strongly urge that the duly published decisions of the Office of the Secretary of the Interior, all applicable departmental regulations, governmentally approved oil and gas leases and Cooperative Unit Agreements, as well as the practice of the Department of the Interior, have consistently interpreted and applied the Mineral Leasing Act of February 20, 1920 as not requiring the lessees of federal onshore oil and gas leases to pay royalties, penalties or assessments on any oil, gas or any other hydrocarbon produced from such federal leases which necessarily is flared or unavoidably lost or which is used in connection with unit operation.

■ This Court cannot lose sight of the general rule that, when the executive department charged with the execution of a statute gives a construction to it and acts upon that construction for many years, the Court looks with disfavor upon a change whereby parties who have contracted in good faith under the old construction may be injured by a different interpretation.

552

In the case of *California v. Deseret Water, O & I, Co.*, 243 U.S. 415, 37 S.Ct. 394, 61 L.Ed. 821 (1971), the United States Supreme Court discussed the binding effect of certain departmental rulings and practices in the following language:

"It is true that the interpretation of the statute has not been uniform in the Department of the Interior, and it has been otherwise construed in at least one of the Federal Courts . . . *But the interpretation for which the state insists has been given to it by the Interior Department.* . . .

In the brief presented by leave of court on behalf of the United States it is set forth that the rule laid down in *Re California*, 28 Land Dec., supra, is still adhered to by the Land Department; that selections aggregating many thousands of acres have been made in reliance upon it, and that no doubt large expenditures of money have been made in good faith upon the selected lands. It is therefore urged that such construction has become a *rule of property. In this situation we should be slow to disturb a ruling of the department of the government to which is committed the administration of public lands.* . . . " (Emphasis added.)

The Supreme Court supported the binding effect of such departmental rulings and practices on the grounds that such administrative rulings and practices had become a "rule of property," and this was especially so where the departmental ruling involved in that case was obviously sound, stating:

"Furthermore, the reasoning upon which the departmental interpretation is founded commends itself to our judgment as best calculated to carry out the purposes intended to be accomplished by the statute in question."

Applying that principle to the facts of this case, the decisions of the Department of the Interior and the long-standing practices under the Mineral Leasing Acts affect substantial rights in and under federal oil and gas leases, which have been held to be interests in real property, *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370 (1932); *Den-*

ver *Joint Stock Land Bank of Denver v. Dixon*, 57 Wyo. 523, 122 P.2d 842 (1942).

The Tenth Circuit has been confronted with the same legal principle as the case at bar.

Judge Breitenstein stated in *United States v. Harrison and Grimshaw Construction Co.*, 305 F.2d 363, 368 (10th Cir. 1962), cert. denied 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229:

"Such interpretations made almost contemporaneously with statute enactment by men charged 'with the responsibility of setting its machinery in motion' are entitled to great weight."

Judge McWilliams held in *Kenneth v. Schmoll*, 482 F.2d 90, 95 (10th Cir. 1973):

"Furthermore, additional weight should be given an administration where, as here, it is of long standing."

Judge Barrett, speaking for the Court in *First National Bank and Trust Company of Chickasha v. United States*, 462 F.2d 908, 910 (10th Cir. 1972), said:

"The general rule is that where the words in statutes are not defined, they are to be interpreted in their ordinary, everyday sense."

The defendants were represented by able counsel and, in fairness to the Court during the arguments on Motions for Summary Judgment, stated:

"This ruling is contrary to the express terms of the lease; it is contrary to the departmental practice, which apparently has been invoked since 1920. It is contrary to prior departmental rulings.

The validity of the Secretary's position in this case is dependent upon the correctness of the conclusions that the Solicitor reached in his opinion of October 4, 1976, and it is to that opinion primarily that we look to find the defendant's position because everything that has been done by the department since then has been predicated on the conclusions reached in that opinion."

A review of the legislative history of the Mineral Leasing Act, together with its many enactments and re-enactments, each leaving intact the wording that a royalty is

to be paid on "value of the production removed or sold from the lease", plus the interpretation placed thereon by the Secretary of the Interior for a long period of time holding that royalties are not to be collected on oil and gas that was unavoidably lost or used in lease operations, are entitled to great weight.

Neither can this Court overlook the language of Section 2(d) incorporated in each of the leases now in existence between the Department, the plaintiffs and intervenors which follows verbatim the language contained in Section 17 of the Mineral Leasing Act.

From the foregoing, I hold that the NTL–4 Notice of the Secretary, expanding and enlarging upon the legislative enactment, is manifestly contrary to the Mineral Leasing Act to the end the Notice is plainly erroneous under the standard of review in the Administrative Procedures Act, and I hold that said Notice is arbitrary, capricious and an abuse of discretion.

For these reasons, the NTL–4 Notices to each of the plaintiffs and intervenors are set aside and held for naught.

Judgment will be in conformity with this memorandum.