**PLACID OIL COMPANY**

v.

**The UNITED STATES DEPARTMENT OF the INTERIOR.**

**HUNT OIL COMPANY**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR.**

Civ. A. Nos. CA–3–79–1095–K,
CA–3–79–1096–K.

United States District Court,
N. D. Texas,
Dallas Division.

April 1, 1980.

A. B. Conant, Jr., Roderick G. Steakley, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for plaintiff.

Rebecca Donnellan, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BELEW, District Judge.

Came on to be heard Plaintiffs in the above styled and numbered causes with their Motions for Preliminary Injunction. After giving due consideration to the briefs of counsel, and after hearing oral argument, this Court is of the opinion that said preliminary injunctions should be GRANTED.

*Discussion*

I. The Facts.

Both Hunt Oil Co. and Placid Oil Co. are lessees of the United States Government of property on the Outer Continental Shelf. The leases involved were executed between Plaintiffs and the Department of the Interior ("Interior") pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331, *et seq.* (as amended, Supp.1979) ("Act") which statute also governs the parties' contractual rights. Under 43 U.S.C. § 1334(a)(1), the Secretary of the Department of the Interior is charged with the administration of leases on the Outer Continental Shelf ("OCS"). The Secretary is also authorized to promulgate any rules or regulations deemed necessary to carry out the provisions of any lease entered into by the Government or to prevent waste and conserve natural resources under the shelf. The Secretary is responsible for the collection of royalties owing to the Government under any offshore lease. It is the latter departmental responsibility which is the subject of this suit.

The Act was adopted in 1953. From that time until late in 1974, Interior had based its royalties on an interpretation of the applicable leases which exempted the following categories of oil and gas from the calculation:

(a) oil or gas which is lost in spills, blowouts or fires;

(b) gas which is vented or flared; and

(c) gas or oil used as fuel for on-lease production activities.

The interpretation that lead to the exemption from royalty calculations of the three categories of oil or gas listed above was based on language both in the Act itself and in the leases between Hunt and Placid and Interior.

Section 8(b)(3) of the Act, 43 U.S.C. § 1337(b)(3) provides in part: "[a]n oil and gas lease issued . . . pursuant to this section shall . . . (3) require the payment of a royalty of not less than 12½ per centum, in the amount or value of the production saved, removed, or sold from the lease . . . ."

Leases entered into by the parties prior to 1974 provide, in part that the oil companies would be required:

to pay the lessor a royalty of 16⅔% in amount or value of production saved, removed or sold from the leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area which are unavoidably lost) is subject to a royalty.

The post-1974 leases provided that the companies would be required "to pay the lessor a royalty of 16⅔% in amount or value of production saved, removed or sold from the leased area. Gas of all kinds (except helium) is subject to royalty." *Plaintiff Placid's Memorandum In Support of its Motion for Preliminary Injunction, p. 6.*

On November 1, 1974, Interior's supervisor in charge of a group of leases owned by, among others, Hunt and Placid, issued a notice to all lessees to the effect that: "[e]ffective June 1, 1974, royalty will be due on all oil and gas produced from all OCS leases. . . . The production subject to royalty . . . includes that oil and gas which is lost in spills, blowouts, and fires, gas which is vented or flared, and oil and gas used on such leases. . . ." *Exhibit A to Plaintiffs' Original Complaints.*

This notice and the procedure for royalty calculation contained in it was a radical departure from practices followed since 1954 and the announcement created a great deal of controversy. *Exhibit "B" to Plaintiffs' Original Complaints at p. 1.* This furor among federal lessees eventually resulted in an interpretation in 1976 of the oil

and gas royalty provisions of the Act and leases entered into thereunder that adopted the procedure outlined in the November, 1974 order. In the 1976 interpretation, the solicitor for Interior recognized that the old method including the three royalty exemptions listed above had been in effect since 1954 and stated that it was incorrect. *Exhibit "B", supra,* at p. 11. The opinion made June 28, 1976 the effective date of the new royalty calculation method for leases under the Act. This recommendation was approved by the Secretary of the Interior.

Finally, on or about July 30, 1979, Plaintiffs received a notice from Interior directing them to review all production records from OCS leases and pay any royalties owing under those leases, including royalties due under the calculation method set out in 1976. The July notice, issued a full three years after the original reinterpretation of the royalty provisions, was the first time the Plaintiffs were directed to recalculate and pay royalties including amounts for vented and flared gas and the like. The instant lawsuits were filed shortly thereafter.

Placid Oil Co. is the larger leaseholder of the two plaintiffs, operating thirteen OCS properties in the Gulf of Mexico. Approximately twenty offshore drilling platforms service about one hundred and fifty different wells on the thirteen leases. Placid is not the sole interest owner in any OCS lease. It is the operator for all of them, but it shares ownership interest with one other oil company on some properties and as many as thirteen companies on other leaseholds. Some of the wells on the Gulf of Mexico properties are dual completion wells. That is, on some wells, oil or gas from two producing horizons is pumped from the same bore hole.

As operator of the leases, it is Placid's responsibility to keep track of the production from each well and to calculate and pay government royalties for all the other interest holders. It then distributes what is due to its co-owners. The calculations required to arrive at these various figures are quite complex. There are a wide variety of

pricing possibilities under the Natural Gas Policy Act and its predecessors which create the need for classification not only of different types and subtypes of natural gas produced but also of sets of producers and owners. Many steps must be taken in the process before a price figure can be arrived at from which a royalty may be derived.

The same kind of problems exist in the pricing of crude oil as well. For the purposes of these cases, however, a detailed examination of these pricing procedures is unnecessary. Suffice it to say that they are quite labyrinthine. A further complicating factor is the periodic occurrence of retroactive pricing adjustments during the period in question.

The record indicates that Placid, in accordance with government regulations, has filed 9–152 forms with Interior for each lease since the leases were entered into. The form is filed on a monthly basis and it contains a record of the total production for each lease. The form breaks down the total production into, among other things, amounts of vented and flared gas, fuel gas and sales gas.

Placid also files a monthly form 9–153 with Interior for each lease. That form verifies Placid's monthly royalty check. It shows, among other things, the amount of gas and any other products sold off of the OCS leases as well as the volumes of gas or oil involved. The long and complicated pricing calculations described earlier must be made in order to fill out these forms.

The forms mentioned above do not contain information concerning what gas or oil comes from which producing horizon or which interest owning companies are large producers and which are small operators. Further, the prices and categories of gas which are reflected on the forms are hypothetical in that there is no direct, one-to-one identification between any specific unit of gas produced and a unit of gas designated as flared, for example, on the forms. The 9–152 and 9–153's also lack any information concerning the nature or specifics of any operating contracts to which Placid may be a party that involve the leases in question.

The record reflects that in order to produce the information necessary to make the royalty payments requested by Interior in this case would cost Placid approximately one thousand man hours.

Hunt Oil Company faces much the same problem with respect to Interior's royalty recalculation request, only on a smaller scale. The record reflects that ten man hours would be sufficient to bring Hunt into compliance with the Interior directive. Hunt has three OCS leases with a total of five wells. It has full joint ownership with one other entity while a third concern has an interest only in the net profits of its joint venture with Hunt.

Plaintiff Hunt makes filings with the Department of Energy ("DOE") that would be affected by Interior's royalty directive. The DOE documents are price exemption requests which are compiled based on Hunt's operating costs. The necessity of paying the additional royalties requested by Interior would serve to raise Hunt's costs and thereby raise the price Hunt would seek to obtain for its gas. The higher prices, if allowed, would eventually be passed on to consumers. The correction and refiling of the DOE documents involved would require about one and one half to two days. This process would have to be reversed if Plaintiffs prevail on the merits of their claims in these lawsuits.

The object of these suits is to test the validity of Interior's re-interpretation of its royalty calculation procedure. The record reflects that Hunt and Placid are not alone in their endeavor. Evidence introduced at the hearing on the motions currently before the court indicate that at least seven separate lawsuits have been filed against Interior in the United States District Court for the Eastern District of Louisiana. Those cases have been brought by nineteen oil company plaintiffs in various combinations. The record further indicates that a substantial number of those plaintiffs have sought relief through administrative channels before filing their lawsuit. There is no indication from the record that any of the companies prevailed in their particular administrative actions.

It is also apparent that one other court has been less than enthusiastic about Interior's directive. In *Marathon Oil Co. v. Andrus*, 452 F.Supp. 548 (D.C.Wyo.1978) the court held that an identical action taken by Interior with regards to onshore leases was arbitrary and capricious and therefore invalid.

Finally, the record indicates that the Department of the Interior, faced with the adverse ruling in the *Marathon Oil* case, *supra*, and with widespread opposition from oil companies, is reassessing its royalty calculation procedure. *Transcript of Oral Argument*, pp. 12–13, 15.

In the motions currently before the Court, Hunt and Placid seek to enjoin Interior from collecting royalties, both retroactively and prospectively, on those categories of gas and other production previously excluded by Interior's prior interpretation of the royalty language in the Act and in the leases entered thereunder.

II. Exhaustion of Administrative Remedies.

In addition to its argument on the question of the propriety of a preliminary injunction in these cases, Interior has raised the threshold argument that injunctions would not be proper in any case because Plaintiffs failed to pursue available administrative remedies before filing these lawsuits. That argument must be addressed before this Court can reach the merits of the injunction requests.

Under existing regulations and the procedures set out in the Act itself, Placid and Hunt had two alternative administrative methods by which they could have protested Interior's royalty directive. Regulations promulgated by Interior provide in part that "[a]ny party to a case adversely affected by a final order or decision of an officer of the Conservation Division of the Geological Survey shall have a right to appeal to the Director, Geological Survey, unless the decision was approved by the Secretary or the Director prior to promulgation." 30

C.F.R. § 290.2 (1978). That right of appeal must be exercised by filing a notice of appeal with the issuing officer within thirty days of the date of service of the order in question. 30 C.F.R. § 290.3 (1978).

Interior argues that, under that regulation, Hunt and Placid should have filed their objections to the royalty directive thirty days after the receipt of the first notice in November of 1974. The fact that they did not do so, argues defendant, precludes them from testing the validity of Interior's action in this Court.

The Act itself provides a procedure whereby funds paid may be recovered by the company if they represent overpayment of royalties due. 43 U.S.C. § 1339 contains language that authorizes reimbursement of any funds paid in excess of the sum lawfully required, if a request is filed within two years of the date of the payment. *43 U.S.C. § 1339(a)*. Subparagraph (b) of that section, however, requires that any repayment must be authorized by Congressional committees. The record reflects that Placid chose to pursue this alternative with respect to two of its leases and the appeal is apparently still pending. Hunt has not availed itself of these appeal methods.

Interior contends that the failure to pursue either of the two avenues of appeal available to them precludes this Court from entertaining Plaintiff's motions.

In some circuits, the exhaustion doctrine does not represent a jurisdictional requirement that must be met before a federal court may hear a particular lawsuit. *See e. g., Montgomery v. Rumsfeld*, 572 F.2d 250 (9th Cir. 1978), *Hayes v. Secretary of Defense*, 515 F.2d 668 (D.C.Cir.1975), *Consumers Union of United States, Inc. v. Cost of Living Council, et al.*, 491 F.2d 1396 (Em. App.1974), *Kale v. United States*, 489 F.2d 449 (9th Cir. 1973), *American Federation of Government Employees v. Acree*, 475 F.2d 1289 (D.C.Cir.1973). The decisions in the Fifth Circuit, however, are not consistent on this point. It has been held, on the one hand, that failure to pursue available administrative remedies is fatal to jurisdiction. *Hodges v. Callaway*, 499 F.2d 417 (5th Cir. 1974). On the other hand, the Appeals Court has noted that "the doctrine of administrative exhaustion is not a strict jurisdictional matter but a flexible concept tailored to the administrative statutes and circumstances." *Ecology Center of Louisiana v. Coleman*, 515 F.2d 860, 866 (5th Cir. 1975); see also *Dent v. St. Louis-San Francisco Railway Company*, 406 F.2d 399 (5th Cir. 1969).

In addition to the broad notion that the exhaustion doctrine is non-jurisdictional in nature, the Fifth Circuit has formulated a number of specific circumstances under which exhaustion of administrative remedies is not necessary. "Generally, unless it has exhausted prescribed administrative remedies, a party involved in an administrative proceeding is not entitled to judicial relief. Complaints that an agency is violating . . . specific statutory language . . ., however, are excepted from this general rule." *OKC Corp. v. Williams*, 461 F.Supp. 540, 546 (N.D.Tex.1978) (citations omitted); *Coca-Cola Company v. Federal Trade Commission*, 475 F.2d 299 (5th Cir. 1973) *cert. den.* 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973).

The United States Supreme Court has also spoken to the nature of the exhaustion doctrine in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the court stated that:

> [t]he doctrine is applied in a number of different situations and is, like most judicial doctrines subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

395 U.S. at 193, 89 S.Ct. at 1662, 23 L.Ed.2d at 203 (footnotes omitted).

■ On the basis of the foregoing authority, this Court finds that the exhaustion doctrine is not an absolute bar to the Court's jurisdiction over Plaintiffs' claims. The Court is not, however, *required* to entertain the merits of the requests for preliminary injunctions. The matter remains within the sound discretion of the trial court. *Hayes v. Secretary of Defense*, 169

U.S.App.D.C. 209, 515 F.2d 668 (1975), *Ecology Center of Louisiana v. Coleman, supra.*

The court in the *Coleman* case, *supra*, recognized several factors to be used by the courts in determining whether to exercise that discretion.

> The criteria used in the [decision] were explicated in *McKart, supra* and they include the following factors: 1) how harsh is the penalty that plaintiff will suffer if barred from asserting his claims in court; 2) even if the penalty is not overwhelmingly harsh, will allowing a by-pass of administrative procedure seriously impair the ability of the agency to perform its functions; 3) does the issue upon which the decision turns involve matters of particular agency expertise; 4) would judicial review be significantly aided by an additional administrative decision, through allowing the agency to make a factual record, apply its expertise or exercise its discretion; 5) how likely is it that the judiciary will be overburdened with suits stemming from the same administrative failure when such suits might have been resolved through the administrative process; and 6) how significant is the role of administrative autonomy—the notion that the courts should not usurp powers and duties entrusted to the agency, and the related notion that "the agency [ought to] be given a chance to discover and correct its own errors."

515 F.2d 860, 866.

The Court must now address these criteria to determine whether it should extend jurisdiction over Plaintiffs' motions. *Ecology Center of Louisiana v. Coleman, supra.*

(1) *Harshness of the penalty.*

There is no penalty as such yet involved in this case. If this Court does not allow Hunt or Placid to assert their claims, they will be forced to spend various amounts of time and money arriving at a sum certain of money which they must then pay to Interior. Once the royalty is paid, Plaintiffs may then sue for a refusal of that royalty under the procedure set out in the Act, 43 U.S.C. § 1339. That provision allows repayment, without interest only upon approval by Congress. Thus, the true nature of the "penalty" which Plaintiffs would suffer is the non-reimbursable expense involved in calculating the royalty that Interior claims is due plus the interest lost during the indeterminate pendency of a refund action.

The sums of the non-reimbursable expenditures Plaintiffs would be required to make if this Court refuses relief are widely disparate. Placid, because of the number of leases, wells and co-owners it is involved with, incur much greater expenses than would Hunt. This Court cannot say that the potential costs Hunt would face would be very harsh. The failure of this Court to entertain Placid's claim, however, would work a substantial hardship on that company.

(2) *Would a by-pass of administrative procedure seriously impair the functioning of the agency?*

It is apparent from the record that no disruption of agency function would occur in this case if the Court took jurisdiction over Plaintiffs' claims. First, if the Court declines to grant the preliminary injunctions sought, no interference in agency function will result. Second, if this Court rules in favor of Plaintiffs in their motions, Interior will be precluded from recovering the royalty payments in question for a time certain. In view of the fact that these particular royalties have not been collected for over twenty years, this Court feels that the delay of a few months more will not substantially impair agency function. It must be noted that no decision on the merits of Plaintiffs' substantive claims is imminent. It could well be that if such an issue were presently ripe for decision, the Court's determination on this particular criterion would be different. The interlocutory relief sought by Plaintiffs at this stage of the proceedings will not, in light of the record, impair agency function.

(3) *Does the issue before the Court turn on matters of particular agency expertise?*

Again, due to the current status of these cases and the precise nature of the issue presently before the Court, no matter of agency expertise is involved. This Court is not faced with a decision on the merits of Plaintiffs' claims. Instead, it is being asked to enjoin agency action until such time as a ruling on the merits is made.

It may be that Interior is the proper party to make an initial determination of the validity of the royalty interpretation in question. Interior's expertise in the area of the administration of mineral leases on government lands is unquestioned. Under the Act and the Mineral Leasing Act of 1920, Interior has been the primary leasing agent for the government for over fifty years. *See 43 U.S.C. § 1331 et seq.*, 30 U.S.C. 181 *et seq.* It is reasonable, therefore, that they be given the opportunity to reassess the royalty payment formula in controversy before the formula is tested in courts. This is especially true since it appears from the record that Interior has not made a final decision regarding royalty payments but in reconsidering its 1974 ruling in light of the District Court's opinion in *Marathon Oil Co. v. Andrus*, 452 F.Supp. 548 (D.C.Wyo.1978), invalidating similar royalty calculation regulations under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*. For the purposes of this opinion, however, this Court need not find that the responsibility for initial review of the issue involved in the merits of Plaintiffs' claims properly rests with Interior and it does not do so. Instead, because the relief sought in the motions presently before the Court is interlocutory and involves no determination on the merits of the case, this Court finds that no matter involving agency expertise is involved.

(4) *Would judicial review be aided by an additional administrative decision?*

If this opinion involved a decision on the merits, judicial review would undoubtedly be aided by an additional administrative decision. Indeed, if Interior were to decide on its own that the royalty calculation method contained in its 1974 notice was invalid, the cases before this Court would be mooted. If, on the other hand, Interior were to make a final decree that the new royalty interpretation was valid, this Court would at least be aided by the knowledge that Interior's position on the issue was final.

As stated above, however, this Court is not presently being asked to make a decision on the merits of this case. Plaintiffs seek interlocutory relief the availability of which involves questions of law. Further, to the extent that factual findings are necessary, it appears from the record that there is no dispute over any material fact involved. Therefore, the marginal benefit of an additional fact record would not be very great. If Interior were to decide that the new royalty formula was invalid, this Court would be aided to the extent that a preliminary injunction, if one was proper in these cases, would no longer be necessary. Interior, however, has apparently been in the process of reconsidering the 1974 notice for quite some time with no results. That observation, taken along with the fact that this Court is not being asked to review an agency action but rather is being petitioned for interlocutory relief, supports a finding that the Court would not be substantially aided by an additional administrative decision or factual record.

(5) *Will the judiciary be overburdened with suits stemming from the same administrative failure?*

It is unlikely that this Court's extension of jurisdiction over Plaintiffs' claims at this stage of the cases will result in a spate of new litigation involving Interior's 1974 notice. This conclusion can be inferred from the large number of lawsuits involving this regulation that have already been filed. Although this Court has no information regarding the current status of those cases, the parties to the instant action would presumably have mentioned any significant rulings in any of them. The Courts in

which these cases are filed are apparently waiting for Interior to make some type of decision regarding the contested royalty procedure before they take any action on the merits. It is doubtful that this Court's extension of jurisdiction over Plaintiffs' claims insofar as their injunction requests are concerned would have any effect in any other jurisdiction.

This Court further notes that, since the original notice regarding the royalty calculation method in question was distributed in 1974, there has been ample time for any interested party to have brought a lawsuit testing its validity. No action taken by this Court on the motions currently before it is likely to spur into action any potential plaintiff who has been dormant to this point.

(6) *How significant is the role of administrative autonomy in this instance?*

As stated in the *Ecology Center of Louisiana* case, *supra*, this criterion deals with the related notions that courts should not usurp the responsibilities of agencies and that agencies should be allowed opportunity to correct their own mistakes. 515 F.2d 860, 866. A decision to take jurisdiction over Plaintiffs' claims would not run afoul of either of those concerns.

This Court would not be infringing upon the particular responsibilities of Interior. Congress has given Interior the authority to enter into mineral leases on behalf of the government and to administer those leases according to the specific directions given in the Act. The precise issue before this Court has nothing to do with the power or duty of Interior to carry out those functions. Rather, the injunctions are sought to preserve the status quo until Interior can decide exactly what its statutory duty is with regard to the royalty procedure in question. At this stage, the Court is not seeking to interpret any language in a lease or statute, nor is it reviewing an agency action. The Court, jurisdiction over these cases, is determining the propriety of an order enjoining Interior from collecting royalty payments from Plaintiffs the validity

of which Interior is unsure about. No interference or usurpation of agency function will result.

The Court is not presently standing in the way of any opportunity for the agency to correct itself. The injunction, if granted, would merely hold in abeyance the collection of certain types of royalty payments. It would not enjoin any pending administrative re-evaluation of the 1974 notice. Interior has ample opportunity to make any corrections in its royalty calculation procedures that it sees fit. The record reflects that most of the plaintiffs in the various other lawsuits filed in Federal District Court for the Eastern District of Louisiana have filed administrative appeals, or have availed themselves of the payment/refund procedures in 42 U.S.C. § 1339. The motions before this Court do not interfere with Interior's disposition of those various administrative actions. Indeed, Plaintiffs' requests for preliminary injunctions anticipate a quick resolution of any action pending before the agency. Therefore, for the reasons stated above, it is apparent that the extension of jurisdiction over Plaintiffs' claims would not usurp any of Interior's duties or responsibilities, nor would it prevent the agency from having a chance to correct its own mistakes.

█ Based on the foregoing discussion, this Court finds: (1) that it may, in its discretion, entertain the two instant lawsuits and; (2) that it can and will exercise its discretion so as to take jurisdiction. Having so found, it now becomes necessary to address the merits of Plaintiffs' motions for preliminary injunctions.

III. The Preliminary Injunctions.

█ In appropriate circumstances, a Federal District Court may issue a preliminary injunction to protect the moving party from irreparable injury and to preserve the Court's power to render a meaningful decision after a trial on the merits. *Meis v. Sanitas Service Corporation*, 511 F.2d 655 (5th Cir. 1975), *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974), 11 Wright & Miller, *Federal Practice*

*and Procedure* § 2947. "The grant of a preliminary injunction lies within the discretion of the district court, and its decision will be overturned only for abuse of discretion." *Compact Van Equipment Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978), *Johnson v. Radford*, 449 F.2d 115 (5th Cir. 1971).

 The remedy, however, is an extraordinary one that must be supported by specific findings of the court on four issues. *Compact Van Equipment Co. v. Leggett & Platt, Inc., supra, Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972). The four criteria the Court must make findings upon in order to support a preliminary injunction are:

(1) there must be a substantial likelihood that the moving party will prevail on the merits;

(2) there must be a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted;

(3) the threatened injury to the moving party must outweigh the threatened harm the injunction may do to the non-moving party; and

(4) granting the injunction must not disserve the public interest.

*Compact Van Equipment Co. v. Leggett & Platt, Inc., supra* ; *State of Texas v. Seatrain International S.A.*, 518 F.2d 175 (5th Cir. 1975); *Canal Authority of State of Florida v. Callaway, supra* ; *Jordan v. Independent Energy Corp.*, 446 F.Supp. 516 (N.D.Tex.1978). The burden of persuasion is on Plaintiffs in this case as to each of the elements above. *Canal Authority of State of Florida v. Callaway, supra.* If Plaintiffs successfully carry their burden as to each of the four elements, a preliminary injunction would be proper. *Hillsboro News Co. v. City of Tampa*, 544 F.2d 860 (5th Cir. 1977). It is necessary, then, to proceed with an analysis of the four criteria.

(1) *Substantial Likelihood that Movant will Prevail on the Merits.*

Plaintiffs have asserted that they will win on the merits of their lawsuits. That claim is based on a number of arguments.

First, Plaintiffs have brought to the Court's attention the case of *Marathon Oil Co. v. Andrus, supra,* in which a Federal District Court in Wyoming has held invalid a royalty calculation procedure identical to the one in issue in the instant case. Hunt and Placid argue that, although the *Marathon* case dealt with the *Mineral Leasing Act of 1920*, 30 U.S.C. § 181 *et seq.*, the similarity of the facts makes that case very persuasive authority with regard to claims under the Act. Interior denies that the *Marathon* case is persuasive due to some dissimilarity in the language of the two statutes involved. This argument, however, is weakened by the fact that, according to the record, Interior is reconsidering the 1974 notice in light of the decision in *Marathon*. Thus, even Defendant feels that there may be some merit to Plaintiffs' claims, in spite of a legal opinion to the contrary issued by the Solicitor of the Department of the Interior.

Plaintiffs further allege that Congressional opinion concerning the royalty provisions of the Act strongly supports their cases. They cite language from a House Committee report to the effect that royalty payments from leases entered into under the Act were based on " 'gross revenue from the lease' . . . *See* H.R.Rep. No. 97–690 [95–590], 95th Cong., 2d Sess. 3, reprinted in [1978] *U.S. Code Cong. & Ad. News* 1450, 1544." *Plaintiff Placid Oil Co.'s Memorandum in Support of Plaintiff's Motion for Preliminary Injunction*, p. 5.

The Act was amended in 1978. Plaintiffs allege, however, that even though Congress was aware of the royalty calculation method, the language of the amendments, as set out in Placid's Memorandum in Support, p. 6, did not make the amendments retroactive. Thus, Plaintiffs argue, there was no Congressional intent to require the types of royalties Interior claims are due. Interior has not answered this argument.

Plaintiffs further claim that the language of the leases, interpreted for over twenty years in a manner excluding from royalty liability those categories of production now in issue, cannot now be unilaterally reinter-

preted. Interior has failed to answer this argument as well.

■ The decision as to whether to grant an injunction requires, among other things, a balancing of the probabilities of the movant's ultimate success on the merits with the possible consequences an injunction might have on the convenience and rights of the parties. *Meis v. Sanitas Service Corp., supra, Sargent v. Genesco,* 492 F.2d 750 (5th Cir. 1974), *Congress of Racial Equality v. Douglas,* 318 F.2d 95 (5th Cir. 1963). Therefore, this criterion must be discussed in combination with the third factor in the analysis. For the purposes of determining whether Plaintiffs have presented a sufficient case on this point to enable the court to engage in the balancing required by the *Meis* case, *supra,* however, it is apparent that Plaintiffs have carried their burden.

■ It is not necessary for Plaintiffs to prove to an absolute certainty that they will prevail on the merits. *Held v. Missouri Pacific Railroad Company,* 373 F.Supp. 996 (S.D.Tex.1974). Instead, it has been held that,

> [t]o justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

*Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953), *Tampa Phosphate Railroad Co. v. Seaboard Coast Line Railroad Co.,* 418 F.2d 387 (5th Cir. 1969), *Held v. Missouri Pacific Railroad Co., supra.* On the basis of the arguments outlined above and the facts thus far before the Court, the Court finds that Plaintiffs have carried their burden with respect to this issue.

**(2)** *Probability of Irreparable Injury.*

Plaintiffs assure the Court that they will suffer irreparable damage if the injunctions are not granted. The thrust of their arguments on this point is that Plaintiffs would be forced to spend considerable amounts of time and money to recalculate their royalty payments back to 1974 to conform with the procedure contained in the 1974 notice. The record reflects that, because of the complex business relationships involved in Placid's OCS leases, Placid would be forced to spend approximately 1000 man hours in order to recalculate the royalty due under the 1974 notice. If Placid were to go through the process and pay the royalties and then prevail on the merits of the lawsuit, it would be due a refund of the money actually given to Interior, but it could not recover interest on the money, nor could it get compensated for the costs of compliance. Hunt's alleged irreparable injury consists of the same elements, but the sum is considerably less. Interior answers Plaintiffs' arguments with the assertion that business costs such as those which Plaintiffs will incur do not rise to the level of irreparable injury.

■ Interior's argument on this point has some merit. Proof of monetary loss, alone, may not be sufficient to carry the burden of persuasion. In *Morgan v. Fletcher,* 518 F.2d 236 (5th Cir. 1975), the Court held that a District Court's partial predication of irreparable injury on the loss of 45% of the family income was erroneous. Plaintiff in that case sought injunctive relief to prevent her employer, a government agency, from firing her until she had been given a full hearing by that agency. The District Court granted a preliminary injunction and the Fifth Circuit reversed, saying that Plaintiff made no showing of irreparable injury sufficient to support the injunction. In its discussion on the injury issue, however, the Court relied on language from a D.C. Circuit case that was quoted with the approval of the Supreme Court in *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). At 518 F.2d 236, 240, the court stated:

[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Virginia Petroleum Jobbers Association v. Federal Power Commission,* 104 U.S.App. D.C. 106, 110, 259 F.2d 921, 925 (1958). The Fifth Circuit concluded by stating that Plaintiff would be entitled to full back pay should her discharge be held wrongful.

The Fifth Circuit employed the same rationale in *Parks v. Dunlop,* 517 F.2d 785 (5th Cir. 1975). In that case, Plaintiff sought to enjoin the Department of Labor from failing to hire him because he was a caucasian. Citing *Sampson v. Murray, supra,* the Circuit Court reversed the trial court's refusal to dissolve a temporary injunction because there was no showing of irreparable injury. The court noted that, were Plaintiff to prevail on the merits, the trial judge would have the power to award him the job he sought, as well as monetary damages based on the pay differential between the position he sought and the one he held. 517 F.2d 785, 787.

Those cases, while revealing the nature of the showing necessary to prevail on the issue of irreparable injury, are factually distinguishable from the case at hand. As stated in *Morgan v. Fletcher, supra,* the key to the analysis is the irreparability of the injury. Here, there is no dispute that the rather substantial costs which would be required of Plaintiffs would not be recoverable. There is no possibility of a damage recovery for costs of compliance. This distinguishes this case from those discussed above. In those cases, the Plaintiffs, if successful, would be fully compensated for all damages incurred. In the instant cases, however, Plaintiffs would not be compensated for a considerable economic loss even if they prevailed on the merits.

The United States Supreme Court has upheld injunctive relief in similar situations. In *Brown v. Chote,* 411 U.S. 452, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973), the Court found that irreparable injury was sufficiently proved when the movant showed that he would be precluded from running for state legislature because of a filing fee requirement. The court stated that "[i]n light of . . . the fact that appellee's opportunity to be a candidate would have been foreclosed, absent some relief, we cannot conclude that the [trial] court's action was an abuse of discretion." 411 U.S. 452 at 457, 93 S.Ct. 1732 at 1735, 36 L.Ed.2d 420 at 424. Again, the lack of an available remedy was the deciding factor.

The Supreme Court has deemed an injunction proper in circumstances very similar to the instant facts. In *Ohio Oil Co. v. E. A. Conway,* 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929) plaintiff sought to enjoin the State of Louisiana from collecting a tax that Plaintiff believed to be invalid. The District Court denied the injunction and the Supreme Court reversed. After stating the general rule regarding the standard to be followed when deciding whether an injunction should issue, the court stated that:

Under this rule [concerning the propriety of injunctive relief] and in view of the entire absence under the local law of any remedy enforceable by the plaintiff if the tax be paid and afterwards held invalid by the final decree, we are of the opinion that the application for an interlocutory injunction should have been granted

. . . .

279 U.S. 813, 815, 49 S.Ct. 256, 257, 73 L.Ed. 972, 973.

That language is directly applicable to the present situation. Although an adequate remedy exists for the recovery of royalty payments made to Interior, there is no provision for the recovery of costs that will necessarily be incurred by Plaintiffs in order to comply with the 1979 notice from Interior.

For the reasons stated above, this Court finds that both Plaintiffs will incur irreparable injury, differing substantially in de-

grees of magnitude, if an injunction is not issued.

(3) *Will the issuance of the injunction harm Interior more than it will help Plaintiffs?*

The record reflects that Plaintiffs have carried their burden on this issue. An injunction at this stage would do no more than delay the collection of royalties that Interior has not collected for over twenty years. If the injunction is not granted, however, Plaintiffs will suffer economic losses that cannot be recovered. On balance therefore, it is abundantly clear that the greater burden would rest upon plaintiffs if they did not prevail in their request for relief.

As discussed earlier, this criterion must be balanced with the likelihood that Plaintiffs will prevail on the merits. *Meis v. Sanitas Service Corp., supra.* This Court has already found that there is a substantial likelihood that Plaintiffs will win and that finding, coupled with the further finding that the difference in the burdens that would fall on the respective parties if they failed in their efforts regarding the motions before the court preponderates in favor of Plaintiffs, serves to further support Plaintiffs' applications for injunctions. The interrelation of the criteria, as discussed by Professor Wright, was noted by the Fifth Circuit in *Canal Authority of State of Florida v. Callaway, supra.*

> [A]lthough a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important.

11 Wright & Miller, *Federal Practice and Procedure* § 2948, at p. 455, cited in *Canal Authority of State of Florida v. Callaway, supra,* 489 F.2d 567 at 576–77. Because the court finds that Plaintiffs have made more than adequate showings on both of these points, the balance clearly falls in favor of Plaintiffs.

(4) *Would granting the injunction disserve the public interest?*

Plaintiffs assert that an injunction would not disserve the public interest. They argue, conversely, that the public interest would not be served if an injunction were not issued. If Plaintiffs were required to pay these royalties, their costs would increase and such increase would result in higher consumer prices. Interior, on the other hand, argues that the injunction would disserve the public interest because it would encourage willful lawbreaking and circumvention of administrative procedures, and it would deprive the United States of revenues to which it is entitled.

These arguments are not well taken. First, the injunction is unlikely to encourage willful lawlessness because of the particular facts in this case. Plaintiffs were unsure of what the "law" was and that uncertainty was exacerbated by the fact that Interior was equally confused. Where a law or an administrative ruling is clear and unequivocal, these types of problems are not likely to occur. Second, an injunction will not result in widespread circumvention of administrative procedure because of the narrowness of the ruling in this case. As stated above, an important reason for taking jurisdiction over these cases in light of the abstention doctrine is the fact that at least 19 oil companies have pursued administrative appeals on the validity of the same ruling presently before the Court. In another case, where administrative avenues of relief have not been so diligently pursued, an injunction of this type might not be appropriate. Finally, the fact that the government may be deprived of some revenue for a short time is of little consequence in light of Interior's twenty-odd year long failure to collect those royalties, or indeed, to even suspect that they were due.

Plaintiffs contend that fuel prices to ultimate consumers will rise if the injunction is

not issued. Even if this assertion were true, the court is not convinced that the price increase would be so significant that its absence would serve the public interest. On balance, therefore, there appears to be no reason why the granting of a temporary injunction in these cases would disserve the public interest.

VI. Conclusion.

■ Based on the foregoing discussion, this Court is of the opinion that injunctive relief should be granted in the above styled and numbered causes. It is therefore ordered that the Department of the Interior be enjoined from collecting royalties from Hunt Oil Co. and Placid Oil Co. on the following categories of production from leases entered into under the Outer Continental Shelf Lands Act, as amended Sept. 18, 1978, Pub.L. 95–372, Title II, § 201, 92 Stat. 632, 43 U.S.C.A. § 1331 *et seq.* (Supp. 1979).

(1) That production which is lost in spills, blowouts or fires;

(2) Gas which is vented or flared; and

(3) Oil and gas used as fuel for lease or unit operations for production activities when utilized in accordance with regulations. This injunction shall remain in effect until such time as the Secretary of the Interior makes a final ruling on the validity of the royalty calculation procedure presently in controversy and, if necessary for so long thereafter as is required until a trial and adjudication may be had on the merits of the question. This injunction shall be dissolved only when the merits of the question of the validity of the royalty calculation procedure are finally decided by a Federal District Court in which a lawsuit testing the procedure is currently pending. Alternatively, the injunction shall be dissolved in the event that the Secretary of the Interior should make a final ruling that said procedure is invalid.

IT IS SO ORDERED.